**Howard M. LASKER and Irving Goldberg, Plaintiffs,**

v.

**Harry G. BURKS, Jr., et al., Defendants.**

**No. 73 Civ. 552 (HFW.)**

United States District Court, S. D. New York.

Sept. 24, 1975.

As Amended Oct. 17, 1975.

Aranow, Brodsky, Bohlinger, Benetar & Einhorn, New York City, for plaintiffs.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for defendants Burks, Hopkins, Kemmerer, Monroney, Phillips & Wade.

Seward & Kissel, New York City, for defendant Fundamental Investors, Inc.

Pollack & Singer, New York City, for defendants Burr, Chalker, Hutchinson, Haire & Anchor Corp.

## MEMORANDUM DECISION AND ORDER

WERKER, District Judge.

This is a shareholders' derivative action brought by two stockholders on behalf of Fundamental Investors, Inc.

("Fundamental" or the "Fund"), a registered investment company under the Investment Company Act of 1940, 15 U.S.C. § 80a–1 et seq. The defendants are the Fund's investment adviser, Anchor Corporation ("Anchor"), a registered investment adviser under the Investment Advisers Act of 1940, 15 U.S.C. § 80b–1 et seq., and several former and present members of the Board of Directors of the Fund. The dispute between the parties centers around the Fund's purchase, on Anchor's recommendation, of $20 million in commercial paper of the now bankrupt Penn Central Transportation Company. As described in detail below the complaint charges that in connection with the purchase of the Penn Central paper the defendants violated various sections of the Investment Company Act, the Investment Advisors Act and the common law. The Fund, joined by all defendants, has now moved under Rule 12(b) of the Federal Rules of Civil Procedure to dismiss this action on the ground that the independent members of the Board of Directors of the Fund have unanimously determined that, in their business judgment, this action is contrary to the best interests of the shareholders of the Fund.

## BACKGROUND

The Fund made its purchases of Penn Central 270-day notes from Goldman, Sachs & Co., in lots of $5 million each on November 26, December 2, 4 and 8, 1969. Unfortunately for the Fund and other holders of Penn Central commercial paper, Penn Central, on June 21, 1970, filed a petition for reorganization under section 77 of the Bankruptcy Act with the result that the notes were not paid at maturity or at any time to date. Faced with the possibility of a substantial loss, the Fund and other plaintiffs instituted suit in the Southern District of New York on November 4, 1970 against Goldman, Sachs & Co., for rescission of their purchases of the Penn Central Notes. That action was entitled *Welch Foods, Inc. v. Goldman, Sachs & Co.*, D.C., 398 F.Supp. 1393 (the *"Welch"* action).

The instant derivative suit was filed on February 5, 1973. Jurisdiction was predicated on section 44 of the Investment Company Act of 1940 (15 U.S.C. § 80a–43), section 214 of the Investment Advisers Act of 1940 (15 U.S.C. § 80b–14) and pendent jurisdiction. The complaint alleges that in making the purchases of Penn Central commercial paper the Fund and Anchor relied solely and exclusively on Goldman, Sachs & Co., and made no independent investigation of the financial condition of Penn Central or the quality of its commercial paper. By failing to make an independent investigation it is alleged that Anchor failed to meet its responsibility as the Fund's investment adviser and that the Fund's directors knew or should have known of, and acquiesced in, the failure of Anchor to meet its responsibilities and thus failed to meet their responsibilities as members of the Fund's Board of Directors. Had an independent investigation been made it is alleged that a number of material adverse facts concerning the financial condition of the Penn Central and the quality of its commercial paper would have been learned. As a result of their actions, or inactions, the defendants are charged with engaging in acts and practices constituting gross misconduct and a gross abuse of trust in respect of the Fund in violation of section 36 of the Investment Company Act. Anchor is also alleged to have violated section 206, the antifraud section of the Investment Advisors Act of 1940. Plaintiffs also claim that the defendants violated their common law fiduciary duty to the Fund and that Anchor, aided and abetted by the directors, breached its investment advisory contract with the Fund.

The complaint goes on to allege that from November 28, 1969 to June 21, 1970, the date Penn Central filed for reorganization, the financial condition of the Penn Central deteriorated. During this period it is alleged that Anchor and the Fund directors failed to commence a thorough and adequate investigation of, and keep under continuous review, the financial condition of Penn

Central and the quality and safety of its commercial papers. It is also alleged that during this period the Fund's directors failed in their obligations to make adequate attempts to resell the Penn Central commercial paper it held and that Anchor failed to advise the Fund of the advisability of selling the commercial paper. Plaintiffs again claim that these acts by the defendants violate section 36 of the Investment Company Act; that Anchor violated section 206 of the Investment Advisers Act; that all defendants breached their common law fiduciary duty; and that Anchor, aided and abetted, by the Fund's directors breached its investment advisory contract. Finally, the complaint alleges that the defendants violated section 13 (a)(3) of the Investment Company Act by allowing the Fund to hold more than 10% of the securities of any one issuer (Penn Central) in contravention of the Fund's registration statement filed pursuant to section 8(b) of the Investment Company Act.

Subsequent to the filing of this derivative action, all defendants moved to stay this action pending the resolution of the claims of Fundamental in the *Welch* action. The stay was granted by Judge Gurfein on November 12, 1973. Fundamental's claims against Goldman, Sachs & Co., in the *Welch* action were settled on July 9, 1974. The terms of the settlement provided that Goldman, Sachs & Co. would take back the Penn Central notes, pay Fundamental $5,250,000.00 in cash and assign to Fundamental a 73.-75% interest in the proceeds of the notes in the reorganization proceedings.

With the settlement of the *Welch* action, Fundamental had to determine what position to take in this suit. It is necessary to set forth in detail the actions taken by the Fund's Board of Directors since it forms the basis of the defendants' motion to dismiss.

Fundamental's Board of Directors met on July 24, 1974 to review the settlement of the *Welch* action and to decide what position to take in this derivative action. Since five of the directors are defendants in this action and one is a director of Anchor, the Board determined that the remaining five directors who they considered disinterested would, acting as a quorum pursuant to the by-laws,[1] decide what position the Fund should take in this action. The five disinterested directors then decided to retain the Honorable Stanley H. Fuld, former Chief Judge of the New York Court of Appeals, to review the entire Penn Central matter and to report to the Board.

After reviewing the complaint in this derivative action, the proceedings in the *Welch* action, the files of Anchor and the Fund relating to the purchase of Penn Central paper and after interviewing officers and employees of the Fund and analyzing the facts and the law, Judge Fuld sent a memorandum to the disinterested directors on December 5, 1974 in which he stated his opinion that there was "no violation by Anchor or by the Fund directors of any provision of statute or of any common law or contractual obligation to the Fund, in connection with the acquisition and retention of the Penn Central commercial

[1]. Section 1 of Article Eight of the Certificate of Incorporation of Fundamental provides that:
"The number of directors which shall constitute the whole board of directors shall be such as from time to time shall be fixed by or in the manner provided in the by-laws which shall also provide the number of directors which shall constitute a quorum; provided, that in no case shall a quorum be less than one-third of the total number of directors nor less than two directors."

Section 4 of Article Six of the By-Laws of Fundamental provides that:
"*Quorum:* Except as otherwise provided by law, the Certificate of Incorporation, or these By-Laws, at all meetings of the Board of Directors one-third of the directors then in office, but not less than three directors shall be necessary for the transaction of business."

paper." (Dec. 5, 1974 Memorandum at 2). Judge Fuld went on to discuss in detail each of the claims asserted in this suit. Finally, Judge Fuld defined and discussed three alternative courses of action which the disinterested directors might pursue, i. e., (1) seek realignment so as to become a plaintiff for the purpose of exercising control over and prosecuting the action; (2) conclude that the action is sufficiently lacking in merit and move to have the suit dismissed; and (3) take a neutral position and permit the action to proceed for the Fund's benefit under the auspices of the present plaintiffs.

After the disinterested directors reviewed his report and submitted questions to him, Judge Fuld sent a supplemental memorandum to the disinterested directors on December 18, 1974. In his memorandum Judge Fuld discussed in more detail the possibility that the Board should move to dismiss this suit as not being in the best interests of the Fund 'and the possible scope of judicial review of such a decision.

The disinterested directors then met in a series of special meetings to consider Judge Fuld's memoranda. The directors met with Judge Fuld; John R. Haire, Chairman and Chief Executive of Anchor; Donald L. Kemmerer and Charles F. Phillips, unaffiliated directors of Fundamental; and Eugene Souther, litigation counsel to Fundamental in this action. Questions were posed by the directors to all of these in attendance concerning the merits of the derivative action and the alternatives open to the Fund's Board. The disinterested directors again met in private and decided to give additional consideration to the problem and convey any questions to the designated Chairman of the disinterested directors, Leon T. Kendall.

A second special meeting of the disinterested directors was held on January 6, 1975. Upon review of the alternatives available, the directors present unanimously determined [2] that the prosecution of this action was contrary to the best interests of the shareholders of Fundamental and that counsel should be directed to seek dismissal of the action. The factors considered by the directors in reaching their conclusion are summarized in the Kendall affidavit ¶ 22, and are as follows:

"(a) Chief Judge Fuld's opinion that there is no merit to the action and little likelihood of its success;

(b) The business interruption to Anchor, distraction of its personnel and the likely inability for it to attract and maintain personnel during pendency of the action necessarily would be harmful to the shareholders of Fundamental;

(c) If the action were to proceed against Anchor with the acquiescence or under the control of Fundamental, the adversary relationship that would be created between Fundamental and Anchor and the attendant serious distraction of Anchor's personnel from their efforts on behalf of the shareholders of Fundamental would leave us no practical alternative but to remove Anchor as investment adviser and to seek to retain a new investment adviser; this would necessarily result in delay, uncertainty and an inevitable lapse in the management of Fundamental's affairs to the serious detriment of its shareholders;

(d) Anchor had acted in good faith and in what it believed was in the best interests of Fundamental's shareholders in purchasing the Penn Central commercial paper;

(e) Anchor had acted reasonably and had followed procedures prudent at the time in light of the then generally

---

2. One director, Mary S. O'Connor, was not present at the meeting. She had previously told Mr. Kendall what her decision was. That vote was reaffirmed by Mrs. O'Conner at a special meeting of the disinterested directors held on January 22, 1975. Even without her presence, four directors would constitute a quorum.

held belief that commercial paper was equivalent to cash;

(f) A vast number of other institutional investors, including many major banks in New York City and throughout the country and certain major mutual funds, had also believed that Penn Central was a sound business enterprise and had purchased Penn Central commercial paper at the time, and many such investors still held that paper when Penn Central petitioned for reorganization;

(g) To take no position at all and thereby to allow two of the more than 90,000 shareholders to determine the course of this action would not be a decision at all, but an avoidance of our obligation to all the shareholders;

(h) Chief Judge Fuld's advice that an investment adviser is not a guarantor of the investments it makes and can only be charged for breaches of contract or of the standards applied by the pertinent statutes and regulations. Chief Judge Fuld had analysed the facts and law and had concluded that Anchor was not at fault and that there was little likelihood that Anchor would be held to have violated any statute or regulation or to have breached any agreement or duty;

(i) Given Chief Judge Fuld's opinion, if the action were to proceed, there could be unnecessary costs to the shareholders of Fundamental for legal fees, both for its own counsel and for the director defendants, who would be entitled to reimbursement of counsel fees if they were found to be liable to Fundamental; and

(j) Even if there were a recovery of the theoretical maximum amount of damages, the net result to the shareholders of Fundamental would be little more than a net recovery of 10 cents per share, or approximately 2% of Fundamental's net asset value. The remote chance of recovering that small amount was not worth the risk of the serious damage to · Fundamental's shareholders which proceeding with this action might produce."

## DISCUSSION

The Fund now argues that the extensive consideration given to the alternatives available to the independent directors culminating in their decision to seek dismissal of this suit was a good faith exercise of business judgment which cannot be upset by the two shareholder plaintiffs who would force Fundamental to maintain this action. The plaintiffs, of course, dispute this position. After emphasizing, the merits of the claims they have assserted and criticizing the conclusions reached by Judge Fuld, plaintiffs make the following arguments in opposition to the defendants' motion to dismiss: (1) because of the broad regulatory legislation embodied in the Investment Company and Investment Advisers Act, the decision whether to prosecute violations of that Act is not a matter of "business judgment" to be decided by directors of a regulated fund; (2) · to seek dismissal of the action would be tantamount to an unlawful ratification of defendants' conduct; (3) if a majority of the board's directors are disqualified, the existence of a "disinterested" minority is irrelevant; (4) as a matter of law the minority directors are not "disinterested;" (5) the minority directors gave undue deference to Anchor in making their decisions; and (6) the motion is premature and defective under Rule 23.1. These arguments will now be considered.

At the outset, the obvious should be stated—a shareholder's derivative suit is an action brought on behalf of a corporation in which any recovery runs in favor of the corporation. Ordinarily, it is the corporation which would seek the right to enforce any cause of action it might have. Rule 23.1 of the Federal Rules of Civil Procedure requires that a complaining shareholder demand action from the board of directors before

bringing suit.[3] The purpose of that "demand" rule "is to give the derivative corporation itself the opportunity to take over a suit which was brought on its behalf in the first place, and thus to allow the directors the chance to occupy their normal status as conductors of the corporation's affairs." *Brody v. Chemical Bank,* 517 F.2d 932 at 934 (2 Cir. 1957), citing *In re Kauffman Mutual Fund Actions,* 479 F.2d 257, 263 (1st Cir.), *cert. denied,* 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 107 (1973).

No demand was made on the Fund's Board of Directors in this case because plaintiffs alleged (and it is not disputed) that the majority of the Fund's directors are defendants charged with wrongdoing and as such a demand would be futile.[4] While no set formula has been developed for determining what facts must be plead in order to excuse a demand on the Board of Directors—*see generally,* 7A Wright & Miller Federal Practice & Procedure § 1831 (1972)— that issue is not presented in this case. Instead, this case presents the rather unique situation where a designated independent minority of a Board has taken unilateral action with respect to a suit brought on behalf of the corporation. The decision of the independent directors was made after the settlement of the *Welch* action which put an end to the

stay in this suit. Plaintiffs argue that even if suit were instituted at the present time (*i. e.,* after settlement of the *Welch* action) no prior demand on the Fund's Board would have been necessary because the majority of directors would be disqualified. To allow a minority of the Board to seek dismissal of the suit would, it is argued, destroy the role of "presumptive disqualification."

While no case is directly in point, this circuit has recently considered an analogous issue in *Brody v. Chemical Bank, supra.* There, the district court had dismissed the derivative causes of action in plaintiff's complaint because the allegations in the complaint were insufficient to excuse a demand on the Board of Directors. Plaintiff had alleged futility of demand because the majority of directors were controlled by the defendant corporation. However, since institution of the suit, a new Board had been installed but no demand was made on it. The Second Circuit agreed that a demand should have been made but remanded because of the gravity of the alleged wrongdoing. 482 F.2d 1111 at 1114 (2 Cir.). After remand, the plaintiffs filed a second amended complaint but made no demand on the Board of Directors because they alleged that a demand on the Board of Directors at the time the action was originally com-

---

3. Rule 23.1 provides:

"In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege (1) that the plaintiff was a shareholder or member at the time of the transaction of which he complains or that his share or membership thereafter devolved on him by operation of law, and (2) that the action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from the shareholders or mem-

bers and the reasons for his failure to obtain the action or for not making the effort. The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association. The action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the court directs."

4. No issue has been raised concerning whether a demand on the shareholders was necessary. Plaintiffs' complaint alleges that under applicable law and the Certificate of Incorporation and By-Laws of the Fund, the directors and officers are vested with the management of the Fund. Complaint ¶ 7(b).

menced would have been futile. The district court again dismissed the derivative counts and the Second Circuit affirmed on the reasoning that a demand should have been made on the new directors. *Brody, supra* at 934.

■ In this case, within a short period after settlement of the *Welch* action and the dissolution of the stay, the Board of Directors met and designated the independent directors to make a decision as to the Fund's position in this suit. In the Court's view, the independent minority of directors had the power to decide what position the Fund should take. This is consistent with the policy that a corporation be given the opportunity to control a lawsuit brought on its behalf, that the Board be allowed to exercise its normal functions in running the corporation, and that a derivative suit should be resorted to as a last alternative. *See* 3B J. Moore, Federal Practice ¶ 23.1.19, at 23.1–252–53 (2d ed. 1974) quoted in *Brody, supra* at 934.

Although the independent directors could properly move for dismissal of this action it is now necessary to determine whether good faith business judgment of the directors can be used as a ground for dismissal. Defendants rely on a line of cases which hold that absent fraud or corruption or other disqualifying factor, the good faith business judgment of the directors not to bring suit is final. *See, e. g., Hawes v. Oakland,* 104 U.S. 450, 26 L.Ed. 827 (1881); *Corbus v. Alaska Treadwell Gold Mining Co.,* 187 U.S. 455, 23 S.Ct. 157, 47 L.Ed. 256 (1903); *United Copper Securities Co. v. Amalgamated Copper Co.,* 244 U.S. 261, 37 S.Ct. 509, 61 L.Ed. 1119 (1917); *Swanson v. Traer,* 249 F.2d 854 (7th Cir. 1957); *Ash v. IBM,* 353 F.2d 491 (3d Cir. 1965), *cert. denied,* 384 U.S. 927, 86 S.Ct. 1446, 16 L.Ed.2d 531 (1966); *In re Kauffman Mutual Fund Actions,* 479 F.2d 257 (1st Cir.), *cert. denied,* 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 107 (1973). *Cf. Allegheny Corp. v. Kirby,* 344 F.2d 571 (2d Cir. 1965), *cert. dismissed,* 384 U.S. 28, 86 S.Ct. 1250, 16 L.Ed.2d 335 (1966).

■ As the Supreme Court recognized in *United Copper, supra,* the decision whether or not to sue is a matter of internal management. 244 U.S. at 263, 37 S.Ct. 509. Absent fraud or corruption or other factors, the stockholders cannot force the corporation to sue.

"[Stockholders] cannot secure the aid of a court to correct what appear to them to be mistakes of judgment on the part of the officers . . . This rule applies whether the mistake is due to error of fact or of law, or merely to bad business judgment. It applies . . . where the mistake alleged is the refusal to assert a seemingly clear cause of action . . . ."

*Ashwander v. Valley Authority,* 297 U.S. 288, 343, 56 S.Ct. 466, 481, 80 L.Ed. 688 (1936).

The reasoning behind the "business judgment rule" and its application to derivative suits was recently discussed in this district in *Bernstein v. Mediobanca,* Docket #73 Civ. 3549, (S.D.N.Y. Dec. 24, 1974) (Connor, J.). There the Court reaffirmed the business judgment rule although summary judgment was denied, with leave to renew, because possible evidence of bad faith on the part of the Board of Directors in deciding not to sue was in the possession of the defendants and plaintiff was given an opportunity to discover it.

■ This court cannot accept plaintiffs' argument that because the allegations of the complaint concern violations of the Investment Company Act and the Investment Advisers Act, the Board has no power to exercise its business judgment because of the strong public policies behind those Acts. Unlike § 16(b) of the Securities Exchange Act which allows shareholders to bring suit if the directors decline a demand, Congress has made no such statutory provision with respect to suits brought under the Investment Company and Investment Advisers Act. It is true that causes of action under those Acts are implied rights of action. *Brown v. Bullock,* 194 F.Supp. 207 (S.D.N.Y., *aff'd* 204 F.2d 415 (2d

Cir. 1961); *Bolger v. Laventhol, Krekstein, Horwath & Horwath,* 381 F.Supp. 260 (S.D.N.Y.1974). It does not necessarily follow that because the right is implied a derivative suit should always be allowed despite the good faith exercise of business judgment by the directors not to sue. This court is of the opinion that absent a statutory exception, whether a cause of action is expressly authorized or is "implied" the directors of a corporation should be given the chance to perform their duties in running the business of the corporation including whether to prosecute a cause of action. If they have exercised their business judgment in good faith then a decision not to sue should be final.

■ The court must also reject plaintiffs' argument that the decision not to sue was tantamount to an illegal ratification. Although it can be argued that derivative suits should be allowed when the Board has refused to sue on a non-ratifiable wrong—*see* Note, Demand on Directors and Shareholders as a Prerequisite To. a Derivative Suit, 73 Harv. L.Rev. 746, 762 (1960); *Rogers v. American Can Co.,* 305 F.2d 297 (3d Cir. 1962), the question of business judgment is separate from the question of ratification. *S. Solomont & Sons Trust v. New England Theatres Operating Corp.,* 326 Mass. 99, 93 N.E.2d 241, 247 (1950). Many of the cases which established the business judgment rule and its relation to derivative suits have involved claims which were arguably non-ratifiable. *See, e. g., United Copper, supra; Ash v. IBM, supra* (antitrust violations).

■ Another question which has been considered is whether the merits of the plaintiffs' claim should be considered in deciding whether the directors decision should be upheld. To do so would place the Court in the position of substituting its judgment for that of the directors which if made in good faith should not be disturbed. The court has carefully reviewed the many factors which the Board considered before making its decision not to sue. Although plaintiffs argue that there is more merit to their claims than Judge Fuld gave them, there were many other factors considered by the directors, as outlined in the Kendall Affidavit ¶ 22—which led the directors to their decision.

If the minority directors were truly disinterested and independent the court will not substitute its judgment for that of the Board. Plaintiffs have not argued that the minority directors have acted fraudulently or corruptly. They have argued that they are not disinterested or independent because they occupy similar positions with other funds in the Anchor group and that Anchor controls the selection and nomination of the Fund's directors. This assertion has been denied and it is alleged by the movant that these directors were nominated by a three man Directors Qualification Committee of which two members were unaffiliated with Anchor.

Interest or lack of independence would go toward the issue of good faith. I am constrained therefore to permit the plaintiffs to pursue discovery with respect to the relationships of the minority directors and the Qualifications Committee to determine whether the minority directors were disinterested or independent. It would appear that all of the other questions resolved herein are dependent upon a resolution of this issue. The plaintiffs are to conduct their discovery within 90 days from the date hereof.

The motion is denied without prejudice to renew the same upon the completion of discovery.

So ordered.